IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CELLCO PARTNERSHIP D/B/A VERIZON )
WIRELESS and CWS VII, LLC,        )
                                  )
          Plaintiffs,             )
                                  )          No. 1:15-cv-2 (LMB/JFA)
     v.                           )
                                  )
THE BOARD OF SUPERVISORS OF       )
FAIRFAX COUNTY, VIRGINIA,         )
                                  )

          Defendant.

MEMORANDUM OPINION

Plaintiffs Cellco Partnership d/b/a Verizon Wireless ("Verizon") and CWS VII, LLC

("CWS") (collectively, "plaintiffs") brought this action under the Telecommunications Act of

1996 ("the Act"), alleging that defendant Board of Supervisors of Fairfax County, Virginia ("the

Board") violated various provisions of the Act when it denied their applications to build a 120-

foot wireless communication facility. They seek an injunction requiring the defendant to approve

their applications. The Board contends that its denial of the applications complied with the

requirements of the Act. The Board also argues that plaintiffs lack standing to dispute its

decision and that plaintiffs are not entitled to injunctive relief.

Before the Court are the parties' cross motions for summary judgment. For the reasons

that follow, the Plaintiffs' Motion for Summary Judgment will be denied and the Board's Motion

for Summary Judgment will be granted.

## I.   BACKGROUND

This civil action concerns the denial of applications by CWS and the Trustees of the

Andrew Chapel United Methodist Church ("ACUMC")[1] to build a wireless communications

facility on the ACUMC grounds, located at 1301 Trap Road, Vienna, Virginia ("the proposed

site").[2] Am. Compl. for Declaratory J. and Inj. [Dkt. No. 11] ("Am. Compl.") ¶¶ 2, 7. Plaintiff

CWS is a wireless network infrastructure developer. Id. ¶ 2. On June 28, 2013, CWS and the

ACUMC Trustees (collectively, the "Applicants") submitted Special Exception Application No.

SE 2013-DR-019 ("SE Application") and 2232 Application No. 2232-D13-9 ("2232

Application") (collectively, the "Zoning Applications" or "Applications"). Id. ¶ 7; Written

Stipulation of Uncontested Facts [Dkt. No. 33] ("Stip.") ¶ 1. Plaintiff Cellco Partnership, a

telecommunications company doing business as Verizon Wireless ("Verizon"), was not a party

to the Applications, but later expressed its intent to enter into an agreement with CWS to locate

an antenna on the proposed site. J.A. at 1245.

The Applicants' SE Application sought approval from the Board to build a 140-foot high

wireless telecommunications facility disguised as a bell tower, with antennas and a related 35-

foot by 70-foot equipment compound ("the proposed facility") on the proposed site. Stip. ¶ 4.

The proposed design would allow for multiple wireless carriers to co-locate on the facility. Id.

¶ 3. The Applicants initially submitted the proposal in June 2013. J.A. at 0691. Fairfax County

("the County") received the initial SE Application on November 26, 2013 and the amended

version on February 27, 2014. Id. ¶ 4, 8. The Applicants' accompanying 2232 Application

sought a determination by the Fairfax County Planning Commission ("Planning Commission")

as to whether construction of the proposed facility substantially conformed to the Fairfax County

---

[1] The Trustees are not plaintiffs in this civil action.
[2] In the written record, the proposed site is referred to as the "Old Ash" site.

Comprehensive Plan, as required by Va. Code Ann. § 15.2-2232. Id. ¶ 5; see also Fairfax County

Comprehensive Plan, 2013 Edition, Policy Plan, Public Facilities, available at

http://www.fairfaxcounty.gov/dpz/comprehensiveplan/policyplan/pubfacilities.pdf

("Comprehensive Plan").[3] The County received the 2232 Application on March 10, 2014. Stip.

¶ 13. The Applicants' Statement of Justification ("Statement"), submitted in April 2014, stated

that Verizon and T-Mobile needed the proposed facility to "address both network coverage and

capacity requirements" in the area, J.A. at 1228, explaining that the current "service gap" along

Route 7 and its surrounding neighborhoods required two new wireless facilities, one to the east

and one to the west of Route 7. J.A. at 1235. The Statement also provided that CWS had no

current plans to develop the structure to the west and had found no desirable alternatives to the

ACUMC site for the location to the east. J.A. at 1236.

The proposed site extends over 7 acres and includes an 18,700 square foot church, a

parsonage house, a playground, a surface parking lot, and a stormwater management pond. J.A.

at 1348. The church's existing attached bell tower measures approximately 30 feet in height.

Stip. ¶ 2. ACUMC operates a nursery school on the premises, and the SE Application also sought

approval of a Category 3 Special Exception to allow for the continued operation of the church

and the nursery school. Id. ¶ 10. The Zoning Applications called for the tower to be located

approximately 77 feet from the parking lot, 90 feet from the property line to the northeast, 190

feet from the property line to the southeast, 212 feet from the dwelling unit on that southeast

parcel, and 150 feet from the playground. J.A. at 1205.

---

[3] The Comprehensive Plan contains a Policy Plan, which "includes a Public Facilities element
that establishes the criteria for Mobile and Land Based Telecommunication Services." Stip. ¶ 16.
Conformity with the Comprehensive Plan includes conformity with the criteria of the
Telecommunication Services section of the Policy Plan. Id. ¶ 17. The Comprehensive Plan
provisions applicable to this action are also in the Joint Appendix. See J.A. at 1229-33.

The proposed site is zoned to the R-1 District (Residential District, One Dwelling Unit/Acre) and is surrounded by other R-1 District properties as well as by a currently undeveloped parcel zoned to the PDH-2 District (Planned Development Housing District, Two Dwelling Units/Acre), and by Colvin Run Elementary School, which is zoned to the R-2 District (Residential District, Two Dwelling Units/Acre). Stip. ¶¶ 6, 11. Five properties listed on the Fairfax County Inventory of Historic Sites—Andrew Chapel United Methodist Church,[4] Vernon Leigh House, Bethel Primitive Baptist Church, Spring Glade, and Andrew Chapel School—are located in the immediate vicinity of the site. J.A. at 1325. The proposed site has been the subject of two previous applications to build telecommunications facilities, J.A. at 1348-49, including a 2002 application by CWS to build a 165-foot tall flagpole monopole, which CWS withdrew after Facilities Planning Branch Staff ("Staff") within the Fairfax County Department of Planning and Zoning ("DPZ") recommended denial due to the monopole's "undesirable visual impact" on the home to the southeast of the lot. J.A. at 1202-03.

The proposed facility bears some similarities to an existing facility at the Dranesville United Methodist Church ("Dranesville Facility"), which is located at 1089 Liberty Meeting Court in Herndon, VA, another R-1 zoned parcel in Fairfax County. Mem. in Opp'n to Pls.' Mot. for Summ. J. [Dkt. No. 73] ("Def.'s Opp'n Br.") at 20. The Board approved an SE Application for that facility in 2011. Mem. of P&A in Supp. of Pls.' Mot. for Summ. J. [Dkt. No. 36] ("Pls.' Summ. J. Br.") at 22. The Dranesville Facility is disguised as a bell tower and stands 120 feet high, id. at 2; however, it was originally built to be 100 feet tall and only later was expanded through the "Feature Shown" process, which does not require a public hearing. Def.'s Opp'n Br.

---

[4] The original Andrew Chapel United Methodist Church was located on this site which now houses St. Athanasius Roman Catholic Church; however, the site is still listed on the registry of historic sites as Andrew Chapel United Methodist Church. J.A. at 0042. The Andrew Chapel Cemetery remains on that site and is directly across the street from the proposed site. Id.

at 20. The Dranesville site differs from the proposed site in that it covers 8.11 acres, Stip. ¶ 30,[5]

is adjacent to a 29-acre commercial property that houses a driving range and miniature golf

course, and the closest historic property is located 1.3 miles from the site. Def.'s Opp'n Br. at 20.

The design of the proposed facility at ACUMC underwent several changes between June

2013 and October 2014, largely in response to concerns voiced by Staff. J.A. at 0011. Most

notably, the height of the proposed facility was reduced from 140 feet to 120 feet. Stip. ¶ 5. That

lower height reduced the number of potential co-locating carriers from five to four. J.A. at 1205.

The applicants also reduced the width of all three sides of the tower, increased the space between

the concealment panels for the antennas, and removed the flame from the traditional Methodist

cross and flame design. Pls.' Summ. J. Br. at 6. During this time period, a group of local

residents formed to oppose the proposal, naming themselves the Stop Andrew Chapel Cell

Tower Group ("SACCT"). J.A. at 0022.

On October 14, 2014, Staff released its report ("Staff Report") on the Applications in

which it recommended that the Planning Commission approve the Applications, concluding that

the proposed facility complied with the Comprehensive Plan and the Fairfax County Zoning

Ordinance ("Zoning Ordinance"). J.A. at 1185-86. Specifically, the Staff Report found that,

"[o]verall, the applicants [had] addressed staff concerns by selecting a location that maximizes

the distance to adjacent [residences], reducing the height and width of the telecommunications

facility, and incorporating design modifications and proposed landscaping to minimize and

---

[5] The parties appear to dispute the size of the Dranesville parcel. Defendant's counsel stated at
oral argument that the Dranesville Facility covers several parcels that together add up to 8.11
acres, while plaintiffs stated that the parcel is just 6.6 acres; however, plaintiffs will be held to
the facts to which they stipulated. Those facts state that the Dranesville United Methodist Church
"is an 8.11 acre property." Stip. ¶ 30.

mitigate visual impacts." J.A. at 1219. The Staff Report's analysis and recommendations were only those of Staff and did not "reflect the position of the Board." J.A. at 1186.

On October 30, 2014, the Planning Commission held a public hearing on the Zoning Applications. Stip. ¶ 22. At the hearing, the Planning Commission heard testimony from 21 opponents of the proposal, including SACCT representatives, their legal counsel, and a local realtor. J.A. at 0022-0078; Def.'s Summ. J. Br. at 3. The Planning Commission also heard testimony from CWS and Verizon's representatives and legal counsel, as well as from members and trustees of ACUMC, some of whom were also local residents, and from Paul Dugan ("Dugan"), a registered professional engineer. J.A. at 0008, 0017-22. At the conclusion of the hearing, the Planning Commission deferred its decision until its November 12 meeting. Stip. ¶ 22. At the November meeting, the Planning Commission unanimously approved the 2232 Application, finding that it substantially conformed to the Comprehensive Plan, and recommended that the Board approve the SE Application. Id. ¶¶ 23-24.

On December 2, 2014, the Board held a public hearing on the SE Application. Id. ¶ 25. The Board heard testimony from many of the same individuals who had testified at the Planning Commission hearing. Seventeen individuals testified in opposition to the project. Def.'s Summ. J. Br. at 3. Some of these speakers discussed an online petition started by SACCT, which garnered 750 signatures opposing the proposed facility, and also described a survey SACCT conducted in the neighborhoods within .75 miles of the proposed site, which showed that 91% of the local residents surveyed opposed the proposal. J.A. at 1370. During the hearing, John W. Foust, a Supervisor for the Dranesville District, stated that he had received 30 emails in support of the proposed facility, almost all of them from members of ACUMC, and had received 62 emails opposing the proposal. J.A. at 1419.

6

Following this hearing, the Board voted 8-1 to reject the SE Application and to overturn the Planning Commission's approval of the 2232 Application, pursuant to Va. Code Ann. § 15.2-2232(B). Stip. ¶ 26. The Board cited as its primary concern the adverse visual impact on the adjacent residential area and public way, due to the proposed facility's height and lack of adequate screening, J.A. at 1424-25, and referenced the Comprehensive Plan's emphasis on siting facilities to allow for future expansion as a concern, because any future increase in the facility's height would "exacerbate the visual impact." J.A. at 1430. The Board also found that that the proposed facility was not harmonious with the use of neighboring residential properties and would negatively impact adjacent historical properties, and determined that Applicants had failed to demonstrate that alternative sites and technologies would not provide adequate coverage. J.A. at 1425-28. On December 23, 2014, the Clerk to the Board issued a letter to the Applicants, informing them of the denial and attaching a verbatim transcript of the Board's denial motion, discussion, and vote. Stip. ¶ 27.

On January 2, 2015, CWS and Verizon filed their original complaint against the Board and Fairfax County alleging various violations of the Telecommunications Act and of state law. Id. ¶ 28. The County was subsequently dismissed from the action, and plaintiffs filed a four-count amended complaint against the Board. Agreed Order Dismissing Fairfax Cnty., Va., and Authorizing Pls. to File an Am. Compl. [Dkt. No. 15]. Count I of plaintiffs' amended complaint alleges that the Board violated the Act's requirement that its decision be supported by substantial evidence in a written record, Am. Compl. ¶ 26, Count II alleges that the Board's action prohibited or had the effect of prohibiting Verizon from providing personal wireless services, id. ¶ 44-45, Count III alleges that the Board's decision was not "in writing" as required by the Act, id. ¶¶ 48-50, and Count IV alleges that the Board's decision was arbitrary and capricious under

state law. Id. ¶¶ 52-57. Plaintiffs seek declaratory judgments that the Board's decision on the
2232 and SE Applications violated the Telecommunications Act and was arbitrary and
capricious. Id.¶ 58-59. Plaintiffs also request an injunction compelling the Board to approve the
Applications. Id. ¶ 60.

## II.   DISCUSSION

Plaintiffs' Motion for Summary Judgment argues that the Board's denial of their
Applications was not "in writing" and was not supported by substantial evidence in the written
record and therefore violates 47 U.S.C. § 332(c)(7)(B)(iii). Pls.' Summ. J. Br. at 16. Plaintiffs
also assert that the Board's denial prohibits or has the effect of prohibiting Verizon from
providing personal wireless services, thereby violating 47 U.S.C. § 332(c)(7)(B)(i)(II). Id. at 30.
The Board denies these contentions and moves for summary judgment, arguing that neither
Verizon nor CWS has standing to bring these claims and that the mandatory injunction sought by
plaintiffs would impermissibly invade the Board's legislative discretion. Answer to Am.
Compl. for Declaratory J. and Inj. [Dkt. No. 16] ("Answer") ¶¶ 62-64.

### A.  Standard of Review

Summary judgment is appropriate where the record demonstrates that "there is no
genuine dispute as to any material fact and that the moving party is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(a). Although the Court must view the record "in the light most
favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th
Cir. 2012), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's]
position will be insufficient" to merit summary judgment. Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009).
Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury

8

could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. Moreover, "[t]he

mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment.

<u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001). Instead, the dispute must be both

"material" and "genuine," meaning that it must have the potential to "affect the outcome of the

suit under the governing law." <u>Id.</u>

      Where the nonmoving party bears the burden of proof, the party moving for summary

judgment may prevail by showing "an absence of evidence to support" an essential element of

that party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-25 (1986); <u>see also</u> <u>Rhodes v. E.I.</u>

<u>du Pont de Nemours & Co.</u>, 636 F.3d 88, 94 (4th Cir. 2011). Once the moving party has

successfully demonstrated that absence, the nonmoving party must "come forward with specific

facts," rather than just "metaphysical doubt[s]," that establish that there is a genuine dispute for

trial. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (internal

quotation marks omitted). The failure to do so "renders all other facts immaterial" and entitles

the movant to summary judgment as a matter of law. <u>Rhodes</u>, 636 F.3d at 94. The court must

"draw any permissible inference from the underlying facts in the light most favorable to the party

opposing the motion;" however, "those inferences must, in every case, fall within the range of

reasonable probability and not be so tenuous as to amount to speculation or conjecture."

<u>Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.</u>, 57 F.3d 1317, 1323 (4th Cir. 1995) (internal

quotation marks and citations omitted).

     **B. <u>Standing</u>**

      The Board argues that, regardless of the merits of plaintiffs' claims, neither plaintiff has

standing to contest the Board's decision. Mem. in Supp. of Def. Bd. of Supervisors' Mot. for

Summ. J. [Dkt. No. 67] ("Def.'s Summ. J. Br.") at 4-7. The "irreducible constitutional minimum

of standing" requires that the plaintiffs (1) have suffered "an injury in fact" that invades "a

legally protected interest" and is both "concrete and particularized" and "actual or imminent;"

(2) that injury is fairly traceable to the defendant's challenged action; and (3) it is "likely, as

opposed to merely speculative," that the injury would be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks and

citations omitted). When a plaintiff was not the object of the challenged government action or

inaction, it is "substantially more difficult" to establish standing. Id. at 562 (quoting Allen v.

Wright, 468 U.S. 737, 758 (1984)) (internal quotation marks omitted). A plaintiff must allege

"such a personal stake in the outcome of the controversy as to warrant his invocation of federal-

court jurisdiction." Summers v. Earth Island Institute, 555 U.S. 488, 493 (2009) (quoting Warth

v. Seldin, 422 U.S. 490, 498 (1975)) (emphasis in original) (internal quotation marks omitted).

This constitutional minimum required for standing is distinct from the cause of action

provided by a federal statute. The Telecommunications Act allows anyone "adversely affected"

by a final decision of a state or local government inconsistent with the provisions of

§ 332(c)(7)(B) to commence an action "in any court of competent jurisdiction." 47 U.S.C. §

332(c)(7)(B)(v). This provision establishes a cause of action under the Act, but contrary to

plaintiffs' assertions, a plaintiff's mere allegation that it has been adversely affected is

insufficient to establish standing to sue under the Act. Contra Pls.' Mem. in Opp'n to Def.'s Mot.

for Summ. J. [Dkt. No. 72] ("Pls.' Opp'n Br.") at 7. Instead, a plaintiff must also establish the

elements of constitutional standing to invoke the court's jurisdiction. Although Zoning

Ordinance § 9-009 provides that only a property owner, easement owner, condemnor, lessee,

contract purchaser, official, department, board or bureau of a government, or condominium can

apply for a special exception, the Fourth Circuit has found that a contract and subsequent

10

cooperation between a landholder and a wireless provider to build a telecommunications facility, accompanied by the provider's expenditure of time and money in pursuing a zoning application, was sufficient to confer constitutional standing on the wireless provider. T-Mobile Ne. LLC v. Loudoun Cnty. Bd. of Supervisors, 748 F.3d 185, 196-97 (4th Cir. 2014) ("Loudoun Cnty.").

> 1. Verizon

The Board argues that Verizon lacks standing to bring this action because it has failed to allege or establish injury in fact, causation, or redressability for any of its claims against the Board. Specifically, the Board argues that Verizon does not have a lease or binding agreement regarding the proposed facility and consequently lacks any legally cognizable interest in the outcome of the Zoning Applications. Def.'s Summ. J. Br. at 5-6. The Board cites the "letter of intent" sent by Verizon to CWS as evidence of Verizon's having merely a speculative interest in the Applications. In that letter, Verizon expresses interest in forming a contract with CWS to locate an antenna on the proposed facility but states that the letter is not contractually binding and does not create a legal obligation. J.A. at 1245. The Board contends that without a legal obligation there is no legally protected interest, and without such an interest there is no causal link fairly traceable between the Board's action and any potential injury to Verizon. Def.'s Summ. J. Br. at 6. The Board also argues that the likelihood that any favorable decision would redress any such injury is merely speculative, because CWS is under no obligation to contract with Verizon even if the Board approves the Applications. Id.

Plaintiffs respond that Verizon "expended significant resources supporting the Applications" by working for a year to develop the proposed design, complying with "numerous procedural requirements," and assembling "expert and other reports at the request of the County," and that Verizon would not have done so absent an expectation that it stood to benefit

from those efforts. Pls.' Opp'n Br. at 7. Plaintiffs argue that Verizon's purpose in expending those resources was frustrated by the denial of the Zoning Applications, that the Board's frustration of that purpose constituted Verizon's injury, and that a decision reversing the denial will redress that harm. Id. Plaintiffs also characterize Verizon as one of the applicants for the zoning permits. Pls.' Summ. J. Br. at 1.

These arguments fail to demonstrate that Verizon has standing to pursue this action. Contrary to plaintiffs' characterization in its later pleadings, the record shows that Verizon was not actually a party to the Applications; rather, CWS and ACUMC were the only applicants. See Am. Compl. ¶ 2 ("CWS and the Trustees…were the Applicants"). For example, the Applicants' Statement of Justification clearly states that "CWS VII, LLC and the Trustees of Andrew Chapel United Methodist Church ("Applicants") hereby submit this Statement of Justification in support of their application for a Special Exception," J.A. at 1227, and the Staff Report states that "[t]he applicants, CWS VII, LLC and the Trustees of Andrew Chapel United Methodist Church" jointly applied for a 2232 review and special exception. J.A. at 1200. Moreover, the Special Exception Affidavit ("Affidavit") lists CWS, the ACUMC Trustees, and their legal counsel as "all Applicants, Title Owners, Contract Purchasers, and Lessees of the land described in the application" and states that all individuals with such relationships to the application must be disclosed. J.A. at 1251-52. There is no mention of Verizon as a co-applicant anywhere in these materials, and plaintiffs stipulated that CWS and the ACUMC Trustees were the only applicants. Stip. ¶ 4. In fact, Verizon could not have been a party to the SE Application because Verizon was not a "property owner, owner of an easement, possessor of the right of entry under the power of eminent domain, lessee, contract purchaser, official, department, board or agent of any government or their agent, or condominium" as required by Zoning Ordinance § 9-009.

Verizon's "letter of intent" is the only evidence of Verizon's potential interest in the site and by its terms does not create a binding contract or other legal interest that would allow Verizon to participate in the application process. J.A. at 1245.

In addition to its September "letter of intent," the evidence in this record of Verizon's involvement in the application process includes a one-page letter to Staff on August 7, 2014. The letter states that Verizon was "seeking to improve its wireless services along Route 7," that the proposed site was a "necessary site to improve" coverage and capacity, and that although Verizon engineers had analyzed the location of one potential alternative site and determined that it would serve Verizon's needs, the proposed site would still be necessary. J.A. at 1243. Verizon did not provide any additional data or analysis by its engineers supporting these assertions. A week later, Verizon sent the Planning Commission a one-page "Statement of Certified Engineer" stating that Verizon had "selected" the proposed site, inaccurately referring to Verizon as "[t]he applicant," and attaching propagation maps. J.A. at 1244. That letter also stated that Verizon had not identified adequate alternative sites and certified that the proposed facility would meet the performance standards of the R-1 District pursuant to Zoning Ordinance § 9-103. Id. On October 7, 2014, several weeks before the Planning Commission hearing, Verizon submitted a four-page letter from Dugan addressing the need for the proposed facility and accompanied by propagation maps he produced. J.A. at 0724. Dugan also submitted a two-page summary of his testimony in front of the Planning Commission as "Supplemental RF Information" on November 6, 2014. J.A. at 0734.

These submissions are insufficient to demonstrate constitutional standing. Verizon was not an applicant for the 2232 review or special exception and lacked any contractual or property interest that would have allowed it to be. Additionally, an attachment to the Statement of

Justification described how CWS, not Verizon or any other party, "focused on Route 7 and its surrounding neighborhoods" to find a location for a facility and eliminated alternative options. J.A. at 1235-36. Although CWS refers in the Statement to Verizon and T-Mobile's need for a facility at the proposed site, CWS does not state that it was working with Verizon to select the proposed site or develop the proposed design. J.A. at 1228. This evidence directly contradicts Verizon's assertions that it selected the proposed site.

Moreover, Verizon's letters and evidence were submitted to the Board approximately eight months after the application process began, and they provide the only evidence in the record demonstrating time and effort expended by Verizon on the Applications. Verizon's handful of letters to the Board hardly constitute lengthy "reports" and pale in comparison to the extensive PowerPoint presentations prepared by SACCT and the quantity of detailed letters sent by SACCT's counsel to the County over a period of months. See, e.g., J.A. at 0887-119. Although CWS representative Thomas Murray, plaintiffs' counsel, and Dugan submitted PowerPoint presentations to the Board and Planning Commission, it is unclear how much Verizon contributed to those presentations. J.A. at 0666-0721. Furthermore, when SACCT raised concerns that plaintiffs' photo simulations were inaccurate, it was Murray who responded to those contentions in a letter that he signed on behalf of CWS, thereby indicating that CWS was the primary party involved in the Applications. J.A. at 0737-38. When plaintiffs' counsel forwarded that response to the Board, he did so "[o]n behalf of the applicants, CWS VII, LLC and The Trustees of Andrew Chapel United Methodist Church." J.A. at 0180-74. These submissions consequently show that Verizon was not involved with the Applications from their inception in 2013, and they undercut Verizon's claim that it helped design the proposed facility and helped select the location.

14

On this record, the Court finds that Verizon was not an applicant, that it lacked any lease

agreement or other enforceable legal interest related to the Zoning Applications, and that it did

not participate in the bulk of the proposal design and application process. This lack of

involvement and of a cognizable legal interest demonstrates that Verizon could not have suffered

a concrete and particularized injury fairly traceable to the Board's actions. Moreover, any such

injury would not be redressable by a favorable decision in this civil action, because even if the

Court ordered the Board to approve the Applications, it could not order CWS to allow Verizon to

locate on the proposed facility absent a legally enforceable contract. Consequently, Verizon has

failed to allege a sufficient personal stake in the controversy to establish standing. Because

Verizon lacks constitutional standing, it is unnecessary to determine whether Verizon was

"adversely affected" under the terms of the Act.

　　　　2. CWS

The Board also argues that CWS lacks standing because although CWS was a co-

applicant, CWS does not allege any property interest in the proposed site sufficient to confer

constitutional standing. Def.'s Summ. J. Br. at 7. The Board further asserts that CWS was not

adversely affected under the terms of the Act because its injury was not proximately caused by a

violation of the Act and is simply derivative of ACUMC's injury. Reply in Supp. of the Bd.'s

Mot. for Summ. J. [Dkt. No. 76] ("Def.'s Reply Br.") at 7 (citing Lexmark Int'l, Inc. v. Static

Control Components, Inc., 134 S.Ct. 1377, 1390 (2014) (discussing whether a plaintiff had a

statutory cause of action under the Lanham Act)). Plaintiffs respond that a property interest is not

required to establish standing and that cases brought by companies like CWS are routine. Pls.'

Summ. J. Br. at 9.

Unlike Verizon, CWS does have a sufficient personal stake in this matter. The Fourth Circuit does not require that a plaintiff possess a property interest to have standing under the Act, but has found that a plaintiff can have standing based on a contract with a landholder and the expenditure of "substantial time and money." Loudoun Cnty., 748 F.3d at 196-97. CWS was clearly one of the two applicants for the proposed facility, Stip. ¶ 4, and there is no dispute that ACUMC wishes to lease its property to CWS should the Applications be approved. Additionally, CWS was the primary participant in the design and application processes. The evidence discussed above demonstrating Verizon's lack of involvement also shows that CWS was involved with the proposal and the Applications from the very beginning in 2013. CWS selected ACUMC as the proposed site, J.A. at 1235-36, worked over the course of a year to refine the proposal, J.A. at 0676, submitted revisions in response to Staff concerns and community opposition, J.A. at 0242, conducted a balloon fly and prepared photo simulations, J.A. at 0737-38, made presentations to the community, J.A. at 0242, and otherwise invested time and resources into pursuing the Applications. Therefore, the Board's action caused CWS to suffer concrete injury that is fairly traceable to the denial. A reversal of the denial would consequently redress the harm to CWS. Accordingly, CWS has adequately alleged a sufficient personal stake in the outcome of the proceedings to demonstrate constitutional standing.

CWS has also been proximately and sufficiently "adversely affected" to bring a claim under the Act. Although defendant's arguments on this point rely primarily on Lexmark, which interpreted the Lanham Act rather than the Telecommunications Act, there is nonetheless no evidence that CWS's injury is merely derivative of ACUMC's or that it was "too remote" from the Board's allegedly unlawful conduct to provide CWS with a cause of action under the Act. See Lexmark, 134 S.Ct. at 1390 (internal quotation marks omitted). CWS and ACUMC were

16

equal co-applicants and both stood to benefit financially from the proposed facility. Additionally, the record indicates that CWS expended significantly more time and resources on gaining approval of the Applications than did the ACUMC Trustees. For instance, the letters of intent and interest sent by wireless carriers are addressed to CWS, J.A. at 0671-73, and CWS signed letters to the Board on its own behalf and without reference to ACUMC. J.A. at 0737-38. In fact, it is unclear from the record how much of a role, if any, the ACUMC Trustees took in designing the proposed facility, complying with procedural requirements, and promoting the Applications. Therefore, CWS's injury is sufficiently proximate to the Board's denial of the Applications to make CWS a party "adversely affected" under the Act. Accordingly, CWS has standing to pursue this action.

### C. Count III: Writing Requirement

Count III alleges that the Board violated the Act's requirement that any decision by a local government regarding construction of a wireless facility "be in writing," 47 U.S.C. § 332(c)(7)(B)(iii), because the Board dated its written denial December 3, 2014 but did not issue its denial and written reasons until December 23, 2014. Pls.' Opp'n Br. at 21. Plaintiffs argue that such "backdating" to December 3 is inconsistent with the Supreme Court's recent ruling that a locality must provide its reasons "essentially contemporaneously" with the denial to avoid shortening the Act's 30 day statute of limitations for appeal. Id. (citing T-Mobile S., LLC v. City of Roswell, Ga.,135 S.Ct. 808, 812, 816 (2015)). Plaintiffs contend that to the extent that the backdating set the date of denial as December 3, the Board violated these standards, but if the denial occurred on December 23, the Board did not. The Board affirmatively states that the date of its denial was December 23, 2014. Def.'s Reply Br. at 13-14. Therefore, there is no factual dispute that the Board provided its reasons "essentially contemporaneously" with its denial.

Plaintiffs also initially claimed that the letter and Verbatim Transcript did not suffice as a "writing" because they were "cursory" and did not "articulate the rationale for the Board's denial as required" under the Act. Am. Compl. ¶ 48. Although plaintiffs appear to have conceded this point by failing to discuss it in their summary judgment briefs in any significant way, this alternative argument also fails. The Supreme Court recently explained that the "in writing" requirement ensures that a reviewing court will "be able to identify the reason or reasons why the locality has denied the application." City of Roswell, 135 S.Ct. at 814. The Court emphasized that the reasons provided simply need to be "clear enough to enable judicial review" and "need not be elaborate or even sophisticated." Id. at 815. Although providing a separate statement explaining the reasons for its decision might be best in terms of avoiding prolonged litigation, a locality does not have to provide its reasons "in any particular format" and "may rely on detailed meeting minutes." Id. at 816.

The Board's denial was issued before City of Roswell was decided, but as discussed below, the Verbatim Transcript provided by the Board contained detailed reasoning by both Supervisor Foust and other members of the Board as to why the Board was denying the Applications. See J.A. at 1460-65. Plaintiffs' allegation that the writing was insufficient because it contradicted the Planning Commission's findings conflates the substantial evidence requirement with the "in writing" requirement,[6] and their description of the Board's decision as "cursory" belies the detailed nature of the Board's reasoning.

---

[6] Plaintiffs also argue that because the Board's denial did not cite to evidence in the record that either contradicted Dugan's testimony or supported its belief that alternative sites were available, the Board lacked substantial evidence for its decision. Pls.' Opp'n Br. at 12-13. Plaintiffs contend that the Board must explain its reasons for "rejecting or discrediting competent evidence," citing a Third Circuit case that the Board correctly argues is inapposite to the Fourth Circuit's highly deferential standard for substantial evidence. Id. at 13 (quoting Cellular Tel. Co. v. Zoning Bd. of Adjustment of Ho-Ho-Kus, 197 F.3d 64, 71-72 (3d Cir. 1999)); Def.'s Reply

Because the Board's writing was sufficient to allow this Court to determine the reasons why the Board denied the Applications, plaintiffs have not provided sufficient evidence from which any reasonable juror could find that the Board violated the "in writing requirement," and defendant will be granted summary judgment as to Count III.

### D.  Counts I and IV: Substantial Evidence and Arbitrary and Capricious

In Count I, plaintiffs allege that the Board violated the Act's requirement that any decision by a local government to "deny a request to place, construct, or modify personal wireless service facilities" be "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). In Count IV, plaintiffs raise a related claim that the Board's decision was arbitrary and capricious under state law. When an action brought under the Act challenges whether the locality's decision was supported by substantial evidence, the court defers to the government and upholds its decision if there is "substantial support in the record as a whole," even if the court would have decided the issue differently. Loudoun Cnty., 748 F.3d at 192 (citing New Cingular Wireless PCS, LLC v. Fairfax Cnty. Bd. of Supervisors, 674 F.3d 270, 274 (4th Cir. 2012) ("New Cingular") (internal quotation marks omitted)).

Substantial evidence is more than a mere scintilla but less than a preponderance of the evidence, and means that the Court must determine whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support" the Board's decision,

---

Br. at 7 (citing AT&T Wireless PCS, Inc. v. City Council of Va. Beach, 155 F.3d 423, 430 (4th Cir. 1998) (upholding denial of an application as based on substantial evidence even though expert testimony and other evidence in the record may have amounted to a preponderance of evidence in favor of the application)).

As discussed above, the Act requires only that the Board provide sufficient reasons in its written denial, not that the Board cite to all the relevant evidence supporting those reasons. City of Roswell, 135 S.Ct. at 814-15. There is no additional requirement under City of Roswell, Fourth Circuit, or Virginia precedent that the Board also discuss all contrary evidence in issuing its denial. Therefore, this argument fails to show that the Board violated either the "in writing" or "substantial evidence" requirements.

recognizing that the "reasonable mind of a legislator is not necessarily the same as the reasonable

mind of a bureaucrat." AT&T Wireless PCS, Inc. v. City Council of Va. Beach, 155 F.3d 423,

430 (4th Cir. 1998) (internal citations and quotation marks omitted) ("Va. Beach"). In the

legislative context, the views of constituents may be "particularly compelling forms of evidence"

that "if widely shared, will often trump those of bureaucrats or experts." Id. Additionally,

evidence of a proposed facility's adverse impact on the surrounding neighborhood or of an

application's inconsistency with the Zoning Ordinance and Comprehensive Plan can constitute

substantial evidence that justifies denial of an application, even when the applicant has provided

conflicting evidence. New Cingular, 674 F.3d at 274.

Under Virginia law, the Planning Commission reviews 2232 Applications to determine

their conformity with the Comprehensive Plan, but the Commission's decisions are subject to

review by the Board of Supervisors and may be overruled by the Board's majority vote. Va.

Code. Ann. § 15.2-2232(B). In reviewing a 2232 Application, the Planning Commission and

Board must determine whether there is substantial evidence of the proposed facility's compliance

with the Comprehensive Plan. Va. Code Ann. § 15.2-2232 (the location, character, and extent of

the facility must be "substantially in accord" with the Comprehensive Plan and the

Commission's decision on any telecommunications facility must comply with the requirements

of the Telecommunications Act).

The Comprehensive Plan directs applicants to avoid constructing new

telecommunications structures and to seek instead to locate proposed facilities on existing

structures if the facilities can be placed in a way that blends inconspicuously with those

structures. Objective 42(a); J.A. at 1229. When existing structures are not available or co-

location on such structures is not appropriate, the Plan states that new structures should be built

where there is "the greatest opportunity to conceal...and minimize their visual impact." Objective 42(b); J.A. at 1230. In particular, the Plan requires designing the facility so as to minimize its impact on "the character of the property and surrounding areas," Objective 42(j), especially if they are residential areas. Objective 43; J.A. at 1231, 1233. In that vein, the Plan also requires locating facilities to protect "views of and vistas from architecturally and/or historically significant structures." Objective 42(m); J.A. at 1232.

The Plan calls for designs that mitigate the "visual presence and prominence" of facilities by "concealing their intended purpose in a way that is consistent with the character of the surrounding area." Objective 43; J.A. at 1233. This mitigation can be accomplished through the use of "camouflage structure design and/or micro-cell technologies...such as distributed antenna systems (DAS)." Objective 42(c); J.A. at 1230. To ensure that concealed facilities remain consistent with the area's character, stealth designs should "resemble other man-made structures and natural features (such as flagpoles, bell towers, and trees) that are typically found in a similar context and belong to the setting where placed," and should "be of a bulk, mass, and height typical of and similar to the feature selected." Objective 43; J.A. at 1233.

Additionally, the Plan expresses a preference for placing new structures on public lands when there are alternative sites providing "similar or equal opportunity to minimize impacts," Objective 42(d), and requires that the height of the proposed facility be "no greater than necessary to allow for co-location while still mitigating the visual impact." Objective 42(h); J.A. at 1230-31. Finally, an applicant must demonstrate that "the selected site provides the best opportunity to minimize its visual impact" and has "the least visual impact on residential areas and the public way, as compared with alternate sites." Objective 42(k); J.A. at 1232.

21

The Planning Commission also reviews SE Applications and makes a recommendation to the Board as to whether they satisfy the criteria of Article 9 of the Zoning Ordinance, but again only the Board has the authority to make a final decision on those applications. Stip. ¶¶ 19-20. A special exception is required when the proposed use is incompatible with or will have an undue impact on the current uses of land. Zoning Ordinance § 9-001; J.A. at 0809. The Board must deny the application if the special exception use will not be compatible with the surrounding neighborhood or does not comply "with all applicable standards." Id.

These standards require that the use "be in harmony with the adopted comprehensive plan" and "with the general purpose and intent of the applicable zoning district regulations." Zoning Ordinance § 9-006 (1)-(2); J.A. at 1334. Moreover, the Board must ensure that the use will "be harmonious with and will not adversely affect the use or development of neighboring properties," and that the "location, size, and height" of proposed facilities and "the nature and extent of screening" will be such that the facility "will not hinder or discourage" the use or development of adjacent properties or impair the value of those properties. Zoning Ordinance § 9-006 (3). The Zoning Ordinance also requires "landscaping and screening in accordance with...Article 13," Zoning Ordinance § 9-006 (5), which similarly seeks "to preserve the character of an area by preventing harmful effects of potentially dissimilar uses." Zoning Ordinance § 13-101. An applicant for a special exception or a 2232 review bears the burden of demonstrating compliance with these criteria.

1. Adverse Impact

Plaintiffs contend that the Board's denial was not based on substantial evidence because the Board inappropriately and exclusively focused on the height of the proposed facility in reaching its decision, Pls.' Summ. J. Br. at 18-19, and did not provide any additional reasons for

its rejection until its later court filings. Pls.' Reply in Supp. of Their Mot. for Summ. J. [Dkt. No. 75] ("Pls.' Reply Br.") at 3. Plaintiffs point to Supervisor Foust's statement that the "fundamental issue" with the proposed facility was its "visual impact…caused by the soaring height of the proposed tower and lack of adequate screening" as evidence that the Board impermissibly rejected the Applications exclusively on the basis of height. Pls.' Summ. J. Br. at 19 (citing J.A. at 1460). Plaintiffs argue that denying the Applications solely because of the proposed facility's height renders the special exception process meaningless and reflects a categorical prohibition on tall wireless facilities that is inconsistent with the Comprehensive Plan. Id. at 21.

The Board responds that its decision was not based exclusively on the proposed facility's height but instead on its noncompliance with multiple provisions of the Comprehensive Plan and Zoning Ordinance and that the denial therefore was based on substantial evidence. Def.'s Opp'n Br. at 5. In particular, the Board argues that it based its decision on the proposed facility's "overall negative visual impact," not just on its height. Id. at 8. Additionally, the Board contends that the proposed facility's incompatibility with the R-1 District and not its height triggered the need for a special exception and that the Board's denial based on the proposed facility's lack of harmony with the surrounding area and potential for negative impact consequently did not undermine the purpose of the special exception process. Id. at 5.

Plaintiffs mischaracterize the quantity and detail of the legitimate reasons given by the Board for its denial. Although Supervisor Foust repeatedly referenced the proposed facility's height, he did so in the context of discussing its "visual impact as a whole" on the residential area surrounding the proposed site. J.A. at 1424-25. He also cited the proposed facility's proximity to other properties, its impact on nearby historical sites, the availability of alternative

sites and technologies, the lack of adequate screening, the lack of resemblance between the

proposed facility and adjacent similar structures, and community opposition, particularly

concerns that the facility would not enhance the community's existing character. J.A. at 1424-31.

Foust tied each of these reasons to specific Comprehensive Plan and Zoning Ordinance

provisions and determined that the proposed facility "[did] not comply with these standards and

objectives." J.A. at 1423-24. For example, Foust referenced Objective 42(k)'s emphasis on

mitigation of visual impact and discussed the adverse impact of a "120-foot tower in an area

where most of the existing structures measure last [sic] than 30 feet in height" and where "the

sparse vegetation on the church property is approximately 50 to 60 feet tall," referring to the

photo simulations that "vividly illustrate the significant adverse visual impact to residents." J.A.

at 1424-25. He also stated that Objective 42(c) "encourages us to consider micro cell

technology…if feasible" and that Applicants had "provide[d] insufficient information to back up

[their] claim" that DAS was not feasible alone in or combination with alternatives. J.A. at 1427.

Additionally, he found that the proposal did not meet Objective 43's directive that "facilities

should resemble structures that are typically found in a similar context," and he agreed with

residents who "d[id] not consider this proposed use to be harmonious with their properties" and

who had "express[ed] legitimate concerns" that the proposed facility would change the character

of their neighborhood of "single-family homes, with a lake, trails, and a wooded area, that backs

up to Wolf Trap." J.A. at 1427-28.

These statements, along with the other detailed reasons Foust provided in recommending

denial, demonstrate that Foust appropriately analyzed the proposed facility according to the

applicable provisions of the Comprehensive Plan and Zoning Ordinance and did so with the

correct emphasis on evaluating the proposal in the context of the character of the proposed

location. Height is certainly relevant to that evaluation, but Foust's statements show that it was not the Board's exclusive consideration and was instead just one aspect of the Board's context-dependent analysis.

Plaintiffs focus on Foust's statements; however, other members of the Board also articulated reasons beyond the proposed facility's height when explaining their decision. Supervisor Smyth reasoned that the design was not "integrat[ed]…into the architecture of the site or the community" and was "out of character with [the] area," J.A. at 1432-33, and Supervisor Gross echoed that assessment and also stated that the Wolftrap Fire Station would provide a "better opportunity" for additional cell service. J.A. at 1435-36. Supervisor Hyland compared the proposed facility to a rejected proposal for a facility in his district that was "too tall, too much for the residential community," the citizens of which had voiced concerns that "it changed the residential character of the community." J.A. at 1436-37. Finally, Chairman Bulova stated that the proposed facility was "truly…out of character" and did not "blend in" sufficiently. J.A. at 1438. These statements clearly demonstrate that the Board was not evaluating the proposed facility solely on the basis of its height and did not issue a categorical prohibition on tall structures. Instead, the Board thoroughly analyzed the Applications according to the Comprehensive Plan and Zoning Ordinance to determine whether this particular structure would be harmonious with the character of the area and otherwise satisfy the applicable Objectives and standards.

Moreover, the Board members' analysis was supported by the written record, which contains substantial evidence of the proposed facility's adverse visual impact on the surrounding neighborhood. Opponents of the proposed facility presented pictures and photo simulations based on a balloon fly test, J.A. at 1377-79, demonstrating that the proposed facility would be

clearly visible from local residents' homes and from across Route 7, J.A. at 0643-46, and that the

closest residents "would have a very clear view of the bell tower looming over their home." J.A.

at 1379. Out of the twenty-two residences with direct views of the tower, thirteen would have a

view of the entire structure. J.A. at 1377. Opponents also presented evidence, including the

below picture, demonstrating that the proposed facility would be at least four times taller than the

nearby homes and at least twice as tall as the surrounding trees, J.A. at 1376, most of which are

deciduous and therefore have no leaves for several months. J.A. at 1382.



J.A. at 0642.

In addition to this evidence of the existing "sparse vegetation," the Board heard evidence that the proposed supplemental plantings would take ten years to grow only 25 feet, less than a quarter of the height of the proposed facility. J.A. at 1383-84.

CWS presented its own photo simulations throughout the application process, including the following two pictures, which showed slightly more screening surrounding the proposed facility but still demonstrated that the facility would have a major visual impact on the surrounding area. The first picture demonstrates the view nearby residents would have of the tower from a location on Windsor Meadows Lane approximately 680 feet west of the site.



J.A. at 0192.

The second picture, taken from a location on Dreamweaver Court approximately 500 feet southeast of the proposed site, shows the view that local residents and travelers along Route 7 would have of the proposed facility. Both pictures demonstrate the existing sparse vegetation and the significant height difference between the proposed facility and the nearby homes and trees.



J.A. at 0704.

CWS also presented the following photograph of the Dranesville Facility, which shows

the scale and visual impact of that existing 120-foot tower.



J.A. at 0667.

Furthermore, although a proposed facility's adverse impact may be "reasonably apparent

to non-experts," Cellco P'ship v. Bd. of Supervisors of Roanoke Cnty., No. Civ.A.7:04 CV

000029, 2004 WL 3223288, at *6 (W.D. Va. July 2, 2004), a local realtor testified that there was "absolutely no question" that the proposed facility would negatively impact home values. J.A. at 1399; see also J.A. at 0559-0606 (materials submitted by Vicki Stottlemyer to the Board). To rebut evidence of diminished home values, CWS submitted a report by the Fairfax County Department of Tax Administration ("DTA") stating that cell towers do not impact home values, but the DTA Director later clarified that although "DTA [was] not aware of any price impairment caused" by cell towers, he was "not comfortable with an unequivocal statement…that cell towers do not cause any value impairment." J.A. at 206. Plaintiffs' limited conflicting evidence regarding adverse impact was far outweighed by the evidence that the proposed facility would have a significant adverse impact on the surrounding neighborhood. This showing of adverse impact is substantial evidence that adequately supports the Board's denial. See New Cingular, 674 F.3d at 274-75.

The record also contained a significant quantum of evidence that the proposed facility would adversely impact the "character of the property and surrounding areas" and thereby violate Objectives 42(j) and 43 of the Comprehensive Plan. The Board received testimony and correspondence stating that the proposed facility would not fit with the character of the "modest, wooded neighborhood setting," J.A. at 0457, would "become the defining feature of the neighborhood," J.A. at 1396, and would alter the neighborhood's "unique essence," in part because the religious nature of the design was not in keeping with the diverse character of the neighborhood.[7] J.A. at 1386-87.

---

[7] Plaintiffs assert that this is not a permissible basis on which to deny the Applications and cite as support a Third Circuit case in which a local governing body selectively applied a local ordinance to prohibit Orthodox Jewish residents from hanging "lechis" (thin black strips) on utility poles. Tenafly Eruv Ass'n, Inc., v. Borough of Tenafly, 309 F.3d 144, 151-54 (3d Cir. 2002). The issue here is not whether residents are being prohibited from exercising their religion

Opponents also presented evidence that the proposed facility would not protect the "views of and vistas from" the nearby historical sites, contrary to Objective 42(m). See, e.g., J.A. at 0483. Staff determined that the effect on the historical properties would not be adverse because the facility would be disguised as a bell tower, J.A. at 1268, but the Board was not bound by that assessment and was given evidence that the bell tower design would diminish the bucolic view that visitors would have from the nearby historic cemetery and other sites, and would be particularly inappropriate at the cemetery "for people who want to contemplate and give remembrance to their deceased family." J.A. at 1387; see also J.A. at 0651. The evidence of inadequate screening and impact on home values discussed above also demonstrated noncompliance with Zoning Ordinance requirements, in particular, the requirement stressing preservation of an area's character. See Zoning Ordinance § 9-006.

Additionally, the Board received evidence that there were alternative sites available on public lands or pre-existing structures that would provide a "similar or equal opportunity to minimize impacts." Objective 42(d). This evidence showed that Applicants had not demonstrated how the proposed site provided the least visual impact "as compared with alternate sites." Objective 42(k). Consequently, the Board had before it a large amount of evidence demonstrating multiple inconsistences between the proposed facility and the Comprehensive Plan. Such inconsistencies provide substantial evidence supporting the Board's denial. New Cingular, 674 F.3d at 274-75.

Plaintiffs argue that the proposed facility does comply with the Comprehensive Plan because Objective 43 encourages camouflage design in the form of a bell tower. Pls.' Summ. J.

---

but whether the design of the proposed facility is in keeping with the character of the neighborhood as mandated by the Comprehensive Plan. There is no evidence that the provisions of the Plan are being selectively applied to discriminate on the basis of religion.

Br. at 19-20. Plaintiffs contend that a wireless facility can be "stealth" without regards to its height "so long as it incorporates the stealth features called for in the Plan," and argue that denying a proposed bell tower design due to its visual impact makes the special exception process meaningless. Id. at 20-21. Plaintiffs further assert that wireless facilities of this kind are "necessarily tall structures" and that the screening and landscaping requirements are meant to minimize just those "aspects of the facility that can reasonably be masked—i.e. the compound and base" and not to mitigate the visual impact of the entire facility. Id. at 21-22. In making these arguments, plaintiffs appear to construe the availability of the SE Application as a mandate that the Board must accept a proposed facility if it is camouflaged as a bell tower, no matter its visual impact or effect on adjacent properties. Such an interpretation mischaracterizes the requirements of the Comprehensive Plan and the Zoning Ordinance. The purpose of an SE Application is to allow a use that is incompatible with the current uses of the land but that will nonetheless be "harmonious with" the Comprehensive Plan and will not adversely impact the surrounding area and its character. See Zoning Ordinance §§ 9-001,-006. Simply camouflaging a facility as a bell tower is insufficient to merit a special exception if these other criteria are not satisfied. See Zoning Ordinance § 9-001.

The proposed facility, although designed as a bell tower, which is a type of camouflage encouraged by the Plan, is not otherwise harmonious with the Comprehensive Plan and Zoning Ordinance. Objective 43 plainly states that camouflage features like bell towers must "belong to the setting where placed" and "be of a bulk, mass, and height typical of and similar to the feature selected." Objective 43. The proposed facility at issue here, although disguised as a bell tower and located on church property, is four times taller than the existing bell tower on the church grounds and the bell tower at the nearby historic St. Athanasius site, making its size far from

31

"typical" for churches in the area. Furthermore, the record demonstrates that the proposed

facility would not "belong to the setting where placed" because ACUMC is a "modest" structure

"surrounded by unassuming residences located in wooded neighborhoods" and the proposed

facility would change the character of that environment. See J.A. at 0481. Opponents of the

facility presented the following picture to demonstrate that lack of harmony.



J.A. at 0649.

Therefore, despite its bell tower design, the proposed facility is inconsistent with the

Plan. This inconsistency constitutes substantial evidence. New Cingular, 674 F.3d at 274-75.

   2. Arbitrary and Capricious

In Count IV, plaintiffs allege that the Board's decision was not based on substantial

evidence because it was arbitrary and capricious according to state law. Specifically, plaintiffs

contend that the Board's approval of a 100-foot tower at the Dranesville Facility and subsequent

denial of their proposed facility demonstrates inconsistent and discriminatory application of the

Comprehensive Plan. Pls.' Summ. J. Br. at 22-23. Plaintiffs argue that the Dranesville Facility is

"materially indistinguishable" from the proposed facility because the tower design is identical,

the Dranesville Facility is located on the same street as ACUMC,[8] and the tower was also approved for an R-1 zoned parcel of similar size and with similar pre-existing uses. Id. at 22. Plaintiffs contend that because the Dranesville Facility was "appropriate under the terms of the Plan, there is no room to argue that an identical 120-foot bell tower is not." Pls.' Opp'n Br. at 11.

Plaintiffs' arguments oversimplify the issue. Under Virginia law, a party claiming discriminatory application of zoning laws must show that "a land use permitted to one landowner is restricted to another similarly situated," and must overcome the presumption that a legislative zoning decision is valid and reasonable. Bd. of Supervisors v. McDonald's Corp., 544 S.E.2d 334, 338-39 (Va. 2001) (quoting Bd. of Supervisors v. Rowe, 216 S.E.2d 199, 209 (Va. 1975)) (internal quotation marks omitted).  The zoning decision must be upheld if there is sufficient evidence of reasonableness to make the issue "fairly debatable." Id. at 338. Simply comparing the height and bell tower design of the two facilities is insufficient to prove that the facilities are similarly situated and overlooks both the presumption of validity due to the Board's decision and the Board's discretion to conduct "site-specific" reviews of every proposed use in a zoning area. See AT&T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment, 172 F.3d 307, 315-16 (4th Cir. 1999) ("Winston-Salem") (ruling that an analogous special use application process allowed the municipal Zoning Board "to perform a site-specific review of each proposed use within a designated zone").

Although the designs of the Dranesville Facility and the proposed facility are facially similar, the two facilities are not similarly situated in terms of their context, location, and zoning history. For example, despite the Dranesville Facility being only a slightly larger parcel of

---

[8] Plaintiffs' argument in this respect is somewhat disingenuous: the facilities are both adjacent to Route 7/Leesburg Pike, a four-lane highway (rather than just a "street"), which runs from the Potomac River to the West Virginia border.

33

land—8.11 acres, as opposed to 7 acres—it differs dramatically from the ACUMC site in being

located next to a 29-acre commercial property and having no historic sites within 1.3 miles.[9]

Def.'s Opp'n Br. at 20. Because the character of each facility's surroundings is distinct, the

impact of each facility on its surroundings would be different. An evaluation of each facility

according to the Comprehensive Plan and Zoning Ordinance therefore implicates distinct issues

and supports different outcomes. It is clear from this record that the facilities differ substantially

on matters that are highly relevant to a 2232 review and an SE Application.

Moreover, the facilities underwent different 2232 and special exception processes. The

Dranesville Facility was originally proposed and built as a 100-foot tall structure, and was only

later extended to 120 feet through the Feature Shown process,[10] which did not require a public

hearing. Def.'s Opp'n Br. at 20. Therefore, in determining whether to approve the initial

applications for the Dranesville Facility, the Board examined the impact and compliance of a

100-foot tower rather than a 120-foot tower, and only heard evidence of community opinion with

regards to that 100-foot tower. There is no evidence in the record regarding the amount of

community support for or opposition to the Dranesville Facility, although there is some evidence

of current dissatisfaction with the facility. See J.A. at 1371. When the Dranesville Facility was

proposed, local residents and the Board based their opinions on the impact of a 100-foot tall

structure in an area already subject to commercial uses, rather than a 120-foot tall structure in an

---

[9] This evidence does not appear to be in the written record; however, the Board discussed it in its pleadings and plaintiffs did not object.

[10] Facilities that are determined by the Planning Commission to be a "Feature Shown" on the Comprehensive Plan are exempt from the 2232 public hearing requirement. Def.'s Opp'n Br. at 6 n. 5. Neither party explains the Feature Shown process in detail and the record does not contain the specific provisions applicable to the process; however, Objective 44 of the Comprehensive Plan provides for "Feature Shown Guidelines." Objective 44 states that with Planning Commission approval, telecommunication facilities to be located on existing or replacement structures are considered a "feature shown" of the Comprehensive Plan "to be processed without a public hearing" as long as they comply with certain requirements.